Devin Bolton (SBN 290037)
dbolton@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Phone: (212) 558-5500
Fax: (212) 344-5461

Diana Gjonaj (*pro hac vice* application forthcoming)
**WEITZ & LUXENBERG, P.C.**
3011 W. Grand Blvd, 24th Floor
Detroit, MI 48202
Phone: (313) 800-4167
Fax: (212) 344-5461
dgjonaj@weitzlux.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK GRAEBER,<br><br>*Plaintiff*,<br><br>v.<br><br>THE DOW CHEMICAL COMPANY; CORTEVA, INC.; and CORTEVA AGRISCIENCE LLC,<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) Strict Products Liability – Design Defect<br>(2) Negligence<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ... 1
II. PARTIES ... 3
  A. Plaintiff ... 3
  B. Defendants ... 3
III. JURISDICTION AND VENUE ... 6
IV. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ... 6
  A. Defendants' Development and Commercialization of Chlorpyrifos ... 6
  B. The Design and Formulation of Defendants' Emulsifiable Concentrate Insecticides ... 8
  C. The Movement of Chlorpyrifos Beyond Its Intended Areas of Application ... 9
  D. The Neurotoxicity of Chlorpyrifos ... 11
  E. Chlorpyrifos Exposure Causes Parkinson's Disease ... 12
  F. Decades of Regulatory Scrutiny and Mounting Evidence of Chlorpyrifos's Risks to Human Health ... 13
  G. The Defective Design of Defendants' Emulsifiable Concentrate Formulations ... 16
    1. Defendants' Formulation Choices Unnecessarily Increased the Risk of Human Exposure ... 16
    2. Safer, Feasible Alternative Designs Existed and Were Known to, Developed by, and Used by Defendants ... 17
    3. Defendants Deliberately Withheld the Safer Design from Their Agricultural and Other Outdoor ECs ... 22
  H. Plaintiff's Exposure to Defendants' Chlorpyrifos Products and Development of Parkinson's Disease ... 23
  I. Limitation on Allegations ... 25
V. CAUSES OF ACTION ... 26
VI. PRAYER FOR RELIEF ... 31
VII. DEMAND FOR JURY TRIAL ... 32

Plaintiff Mark Graeber ("Plaintiff") brings this product liability action against The Dow Chemical Company, Corteva, Inc., and Corteva Agriscience LLC (collectively, "Defendants"), for personal injuries suffered as a proximate result of exposure to Defendants' chlorpyrifos insecticides. Based on personal knowledge as to Plaintiff's own acts and experiences, and upon information and belief as to all other matters, Plaintiff alleges the following:

## I. INTRODUCTION

1. This is an action arising from Defendants' design, development, manufacture, marketing, and sale of chlorpyrifos emulsifiable concentrate insecticides, sold under brand names such as Lorsban 4E and Dursban (collectively, Defendants' "chlorpyrifos ECs"), that caused Plaintiff Mark Graeber ("Plaintiff") to develop Parkinson's disease following prolonged exposure to Defendants' product.

2. For decades, Defendants profited from the widespread sale and use of chlorpyrifos and chlorpyrifos ECs while exposing applicators and unsuspecting individuals living, working, and going about their daily lives to the dangerous consequences of their product design choices. Whether handling or applying Defendants' products, working in treated areas, or simply living and raising families in surrounding communities, these individuals were exposed to a dangerous neurotoxicant through the intended and foreseeable use of Defendants' products.

3. Chlorpyrifos is a neurotoxic organophosphate that kills insects by attacking their nervous systems and is toxic to the human nervous system as well. A substantial body of scientific research links chlorpyrifos exposure to an increased risk of Parkinson's disease, and Defendants knew, or should have known, of the neurological dangers their products posed, including the risk of Parkinson's disease from prolonged exposure.

4. The danger was not confined to the target pest. Once absorbed, chlorpyrifos is converted in the body into chlorpyrifos-oxon, a far more potent toxin. Chlorpyrifos also injures the dopamine-producing neurons whose loss defines Parkinson's disease through pathways separate from, and unnecessary to, its intended insecticidal action.

5. Despite this knowledge, Defendants continued to design, manufacture, market, and sell chlorpyrifos in formulations that left the active ingredient readily available for human

absorption during handling, mixing, loading, and application, and upon contact with treated surfaces, while also permitting chlorpyrifos to drift, volatilize, and migrate far beyond its intended areas of application. As a result, pesticide applicators, agricultural workers, and surrounding communities were unnecessarily exposed to a dangerous neurotoxicant. These exposures were not unavoidable consequences of controlling agricultural pests; they were caused and exacerbated by Defendants' choices concerning the design and formulation of their products.

6. Safer designs existed – and Defendants held one. As early as 1990, Defendants had registered and were selling a microencapsulated chlorpyrifos for use in homes, schools, hospitals, and other indoor environments where human exposure was foreseeable. Defendants recognized that encapsulation could reduce human exposure to chlorpyrifos, and their own later testing demonstrated that microencapsulated formulations could reduce volatilization and were many times less acutely toxic than their flagship chlorpyrifos EC (Lorsban 4E) while performing as well or better. Rather than extending this technology to their agricultural products, Defendants confined their use of controlled-release chlorpyrifos to a limited specialty market and continued to manufacture and sell dangerous chlorpyrifos ECs for widespread agricultural and other outdoor uses.

7. As a direct and foreseeable result of exposure to Defendants' defective and unreasonably dangerous products, Plaintiff developed Parkinson's disease. Had Defendants adopted and/or utilized the safer designs available to them, including the one they themselves patented, or stopped selling chlorpyrifos ECs, Plaintiff's exposure would have been prevented or substantially reduced, and Plaintiff would not have suffered the devastating injuries alleged herein.

8. Plaintiff has suffered and continues to suffer serious and permanent injuries, physical pain and suffering, emotional distress, loss of enjoyment of life, past and future medical expenses, economic losses, and other damages, and brings this action to recover compensatory and punitive damages and all other available relief.

## II. PARTIES

### A. Plaintiff

9. Plaintiff Mark Graeber, an individual, is a citizen and resident of the State of California, with a principal place of residence in Fresno County.

10. From approximately 1998 to 2002, Plaintiff was regularly exposed to chlorpyrifos designed, manufactured, distributed, and/or sold by Defendants at his residence in Clovis, California, which was near land that was repeatedly treated with Defendants' chlorpyrifos ECs. Later, from at least 2009 to 2018, Plaintiff was again regularly exposed to chlorpyrifos designed, manufactured, distributed, and/or sold by Defendants while working for a Tulare County farm equipment supplier located in and around agricultural land in Exeter, California. Mr. Graeber's workplace was next to land that was repeatedly treated with Defendants' chlorpyrifos ECs, and part of his job responsibilities included performing on-site and in-field research and development work following insecticide applications.

11. On or about November 16, 2021, Plaintiff was diagnosed with Parkinson's disease at Community Regional Medical Center in Fresno, California. Prior to 2026, Plaintiff neither knew nor had reason to suspect that exposure to chlorpyrifos had caused or contributed to his disease.

### B. Defendants

12. At all relevant times, Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the design, manufacture, and/or sale of chlorpyrifos and chlorpyrifos emulsifiable concentrate products ("chlorpyrifos ECs").

13. Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the design, manufacture, and/or sale of chlorpyrifos and chlorpyrifos ECs with the knowledge that chlorpyrifos is toxic to humans and would be released into the environment, even when used as intended and as instructed by the Defendants.

14. Defendant The Dow Chemical Company ("Dow Chemical") is a corporation organized under the laws of Delaware with its principal place of business in Midland, Michigan. Dow Chemical is authorized to and does, in fact, conduct business in the State of California.

15. In 1989, Dow Chemical formed DowElanco, a joint venture with Eli Lilly and Company ("Elanco"), to develop and sell agricultural chemicals. On information and belief, all or part of Dow Chemical's existing chlorpyrifos product line and related liabilities passed to DowElanco on or around the date of its formation. In 1997, Dow Chemical purchased Eli Lilly's interest in DowElanco and renamed the entity Dow AgroSciences LLC ("Dow AgroSciences").

16. In 2017, Defendant Dow Chemical and E.I. du Pont de Nemours and Company (DuPont) merged to form DowDuPont Inc. ("DowDuPont").

17. In 2019, DowDuPont separated into three publicly traded companies. On information and belief, the agricultural business, including all or part of the Dow Chemical and Dow AgroSciences chlorpyrifos product line and liabilities, was spun off into Corteva, Inc. on or about June 1, 2019.

18. Defendant Corteva, Inc. ("Corteva") is a corporation organized under the laws of Delaware with its principal place of business in Indianapolis, Indiana. Defendant Corteva is registered to do business in the State of California.

19. Defendant Corteva Agriscience LLC ("Corteva Agriscience"), formerly named Dow AgroSciences LLC ("Dow AgroSciences"), is a limited liability company organized under the laws of Delaware in 1997, with its principal place of business in Indianapolis, Indiana. Dow AgroSciences changed its name on January 1, 2021 to Corteva Agriscience following the Dow Chemical-DuPont spin-off into Corteva. On information and belief, Defendant Corteva Agriscience is the wholly owned operating subsidiary through which Defendant Corteva designed, formulated, manufactured, marketed, and/or sold chlorpyrifos and chlorpyrifos ECs. On information and belief, for jurisdictional purposes, its members are citizens of the states of Iowa, Delaware, and Indiana.

20. Except where otherwise specified, references to "Defendants" in connection with the historical development, design, formulation, manufacture, and commercialization of chlorpyrifos ECs include the named Defendants and, as applicable, their predecessors, predecessors-in-interest, subsidiaries, affiliated entities, and other entities through which the chlorpyrifos business was conducted, to the extent that the named Defendants participated in, assumed liability for, or otherwise bear legal responsibility for the conduct alleged herein.

21. On information and belief, through the corporate transactions, reorganizations, and transfers described above, Defendants retained, assumed, acquired, and/or succeeded to some or all of the rights, obligations, and liabilities associated with the development, design, formulation, manufacture, marketing, and sale of the chlorpyrifos ECs at issue in this action. The precise allocation of these responsibilities and liabilities among Defendants, including the terms of any agreements governing their assumption or transfer, is not presently known to Plaintiff and is within Defendants' possession, custody, or control.

22. On information and belief, at relevant times, Defendants acted directly and/or through their respective agents, subsidiaries, affiliates, predecessors, and successors in connection with the conduct alleged herein. To the extent Defendants acted through agents or joint ventures, such conduct was undertaken within the course and scope of those relationships and with the knowledge, authorization, and/or ratification of the responsible Defendants.

23. On information and belief, at all relevant times, Defendants, and each of them, were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Fresno and Tulare Counties.

24. Upon information and belief, at all relevant times, Defendants, and each of them, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Fresno and Tulare Counties, either directly or indirectly through third parties or related entities, chlorpyrifos and/or chlorpyrifos-containing insecticide products.

25. At all relevant times, Defendants, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing, and distributing chlorpyrifos and/or chlorpyrifos-containing insecticide products in the State of California, including Fresno and Tulare Counties, and said Defendants derived substantial revenue therefrom.

## III. JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

27. This Court has personal jurisdiction over Defendants because Plaintiff's claims arise out of and relate to Defendants' purposeful marketing, distribution, and sale of chlorpyrifos ECs in California, including for agricultural and outdoor application in Fresno and Tulare Counties, where Plaintiff was exposed and injured.

28. Defendants regularly conduct and solicit business in California, provide products and/or services by or to persons here, and derive substantial revenue from the same. Furthermore, Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Defendants have had sufficient contact with the State such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

29. Venue is proper in this Court under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this judicial district, and the Defendants regularly conduct business in this district.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. Defendants' Development and Commercialization of Chlorpyrifos

30. Chlorpyrifos does not occur naturally. It is a synthetic organophosphate pesticide used to control a wide range of insect and arthropod pests.

31. Dow Chemical discovered chlorpyrifos (initially designated "Dowco 179") through its research into the insecticidal properties of synthetic organophosphates during the 1950s-1960s. The first chlorpyrifos-based insecticide was introduced to the market in the mid 1960s under the brand name Dursban, and Dow Chemical received a patent for the compound in April 1966.

32. Dow Chemical immediately recognized the substantial commercial potential of chlorpyrifos because of its broad-spectrum insecticidal activity and versatility across numerous

pest-control applications. By the late 1960s, Dow Chemical commercially launched chlorpyrifos for use in the turfgrass, ornamental plant and shrub, and indoor pest-control markets.

33. Dow Chemical subsequently expanded the commercial uses of chlorpyrifos into agricultural production. By the mid-1970s, Dow Chemical was marketing chlorpyrifos for application to crops including corn, cotton, and peaches. Over time, its agricultural uses expanded to include numerous additional field, fruit, vegetable, and nut crops. Chlorpyrifos was applied through a variety of methods, including ground boom and aerial spraying of crop foliage, airblasting, chemigation, and applications to soil.

34. Dow Chemical designed, manufactured, marketed, and sold chlorpyrifos through multiple commercial formulations designed for different pest-control applications. These included emulsifiable concentrates ("EC"), granulars ("GR"), and wettable powders ("WP"). Dow Chemical's chlorpyrifos products were registered and sold in the United States, including California, under various trade names, including Dursban for indoor, structural, and horticultural pest control, Lorsban for agricultural pest control, Hatchet, Cobalt, Equity, Lock-On, and Empire, among others.

35. Among Dow Chemical's agricultural chlorpyrifos products was Lorsban 4E, an emulsifiable concentrate containing approximately four pounds of chlorpyrifos per gallon. Dow Chemical marketed Lorsban 4E for use on a broad range of agricultural crops, where it could be diluted and applied using conventional pesticide application equipment.

36. As chlorpyrifos use expanded, responsibility for its design, manufacture, and commercialization passed through Dow Chemical's agricultural chemical businesses and their corporate successors, including DowElanco, Dow AgroSciences, and Corteva Agriscience. Throughout this period, chlorpyrifos remained one of the most widely used organophosphate insecticides in the United States, generating substantial revenue for Defendants while exposing pesticide applicators, bystanders, and surrounding communities to its toxic hazards.

### B. The Design and Formulation of Defendants' Emulsifiable Concentrate Insecticides

37. An insecticide's "formulation" is the complete commercial product as sold and applied. It consists of the active ingredient (the chemical that kills the target pest) together with what is referred to as "inert" or "other" ingredients, including solvents, surfactants, emulsifiers, carriers, stabilizers, and other additives. The term "inert" is a regulatory one and denotes only that an additive does not possess direct pesticidal activity; it does not mean the ingredient is biologically inactive, non-toxic, or without adverse effects on human health.

38. An emulsifiable concentrate (commonly abbreviated "EC" or designated by the letter "E" in a product name) is a liquid formulation in which the active ingredient is dissolved in one or more organic solvents alongside emulsifying agents. The resulting product is a concentrated liquid carrying a high percentage of active ingredient by weight.

39. Defendants designed, manufactured, registered, marketed, and sold chlorpyrifos as an emulsifiable concentrate (chlorpyrifos dissolved, unprotected, in organic solvent carriers) for widespread agricultural and other outdoor uses, as well as for structural, horticultural, and institutional pest control, under brand names including Lorsban 4E and Dursban, among others. Except where a specific product is identified, this Complaint refers to Defendants' chlorpyrifos emulsifiable concentrate products, including but not limited to Lorsban 4E, Dursban, Hatchet, Cobalt, Lock-on, and any other chlorpyrifos emulsifiable concentrate of materially similar design that Defendants designed, manufactured, and/or sold, collectively as Defendants' "chlorpyrifos ECs."

40. In emulsifiable concentrates, the active ingredient remains dissolved in the solvent phase throughout dilution, application, and deposition. This design is hazardous in at least two respects. First, it leaves the neurotoxic chlorpyrifos active ingredient unshielded: because no physical or chemical barrier isolates it, chlorpyrifos in an EC formulation is readily available for dermal absorption and inhalation during handling, mixing, loading, and application, as well as through subsequent contact with treated surfaces. Second, the volatile organic solvents used to dissolve the chlorpyrifos can evaporate during and after application, which contributes to droplet

evaporation and off-target drift during spraying. And after application, as the spray dries, the unshielded chlorpyrifos deposited on treated surfaces volatilizes into ambient air for hours and days afterward, exposing individuals in and around treated areas.

### C. The Movement of Chlorpyrifos Beyond Its Intended Areas of Application

41. Chlorpyrifos-containing insecticides were applied to agricultural fields, forage, commercial turfgrass (such as golf courses and sod farms), and horticultural facilities to control insect pests. Once applied, however, chlorpyrifos failed to remain confined to the target vegetation, soil, or treatment zones. These outdoor, wide-area applications caused chlorpyrifos to migrate into the surrounding environment and adjacent communities through spray drift and post-application volatilization.

42. Spray drift occurs when pesticide-containing droplets or mist particles move away from the intended treatment area during application. Post-application volatilization is a separate and distinct process whereby pesticides deposited on foliage, soil, turf, or other surfaces convert into vapor after application and evaporate into ambient air.

43. The extensive post-application volatilization of chlorpyrifos and the inherent inability of Defendants' emulsifiable concentrates to remain confined to target application sites has been documented in published scientific literature and known to Defendants for decades. Across over forty years of research, studies evaluating chlorpyrifos applied to agricultural crops, turfgrass, and soil have demonstrated substantial losses of chlorpyrifos from treated surfaces over time, while separate atmospheric monitoring and field studies have documented the release and transport of chlorpyrifos through ambient air. Together, this research establishes that chlorpyrifos does not remain confined to its intended areas of application and that exposure can continue after pesticide applications have concluded. Illustrative studies include, among others:

a. **1968 (Foliar Dissipation and Environmental Loss):** In a published 1968 field evaluation of Dow Chemical's 40.8% EC Dursban formulation applied to corn and pasture grass, researchers documented rapid declines in chlorpyrifos on treated vegetation. Within 24 hours, the amount of chlorpyrifos present on pasture grass decreased by approximately 44% and 38% on corn. The chlorpyrifos continued to decline over subsequent weeks, with roughly only 1% remaining on pasture grass by day 21. By contrast, chlorpyrifos remained relatively stable for 30 days when treated vegetation was stored in enclosed silage jars. These findings demonstrated that

chlorpyrifos dissipated rapidly from vegetation in outdoor conditions while remaining comparatively stable in enclosed storage, consistent with environmental processes such as volatilization.

b. **1978 (Turfgrass Dissipation & Irrigation):** In a 1978 field study evaluating chlorpyrifos applied to turf, half of the chlorpyrifos in emulsifiable concentrate formulations (chlorpyrifos 2E) applied to grass dissipated within approximately one week. Watering had relatively little effect on the distribution of chlorpyrifos between grass and soil.

c. **1979 (Golf Course Turfgrass Dissipation and Soil Movement):** In a 1979 study evaluating chlorpyrifos 4E applied to a golf course fairway, over 40% of the chlorpyrifos dissipated from the grass-thatch layer within the first seven days, and approximately 91% was no longer present after eight weeks. Despite substantial irrigation immediately following application, the intended downward movement was limited, with less than 1% of the applied chlorpyrifos reaching the deeper underlying soil area.

d. **1980 (Soil Dissipation):** In a two-year field study evaluating Lorsban emulsifiable concentrate applied to mineral and organic soils, researchers documented substantial declines in chlorpyrifos over time. In sandy mineral soil, only 50% of the applied chlorpyrifos remained after two weeks, and only 5% remained after 24 weeks. In organic soil, only 50% of the applied chlorpyrifos remained after eight weeks and only 13% remained after 24 weeks. The researchers identified volatilization as one of the processes contributing to chlorpyrifos dissipation from soil.

e. **1993 (Multi-Week Soil Volatilization):** In a 1993 field study examining chlorpyrifos applied as an emulsifiable concentrate to conventionally tilled and no-till soils, researchers measured airborne chlorpyrifos and calculated volatilization rates over a 26-day period following application. The researchers estimated that approximately 49% of the chlorpyrifos applied to no-till soil volatilized during the study period. Volatilization continued through the final day of monitoring, demonstrating that chlorpyrifos can be released into the atmosphere for weeks after spraying operations conclude.

f. **1999 (Long-Range Atmospheric Transport):** In a peer-reviewed atmospheric transport study, researchers investigating pesticide transport from California's Central Valley to the Sierra Nevada Mountain Range found measurable concentrations of chlorpyrifos and its toxic oxon transformation product in ambient air and surface waters across high-elevation wilderness areas (from 200-m up to 2,000-m). Chlorpyrifos and chlorpyrifos-oxon were detected in air at all three monitoring elevations and were consistent with the heavy summertime agricultural use in Fresno and Tulare Counties, which are upwind of the Sierra Nevada Mountains.

g. **2006 (Substantial Volatilization from Treated Crops):** In a controlled field study evaluating crop canopies (potato plants), researchers measured atmospheric chlorpyrifos concentrations following a Dursban EC application and determined that cumulative daytime volatilization losses reached approximately 63-66% of the applied chlorpyrifos, with vapor emissions continuing across multiple days following treatment. The researchers concluded that volatilization was the dominant process responsible for the decline of chlorpyrifos from treated foliage.

44. Government regulatory reviews have likewise documented chlorpyrifos moving off treated fields through the air, both as spray drift during application and as vapor afterward, as described in Section F below.

45. Independent of and beyond the extensive published literature, Defendants had long-standing, actual knowledge of chlorpyrifos's high volatility and the inherent instability of their EC formulations. In published papers by Dow's own scientists, Defendants explicitly recognized that post-application volatilization from soil, foliage, and turfgrass constitutes a primary and major dissipation pathway. Defendants designed and marketed their emulsifiable concentrate products knowing that chlorpyrifos would drift during application and would volatilize afterward and, on information and belief, were fully aware that this formulation choice inevitably resulted in large-scale chlorpyrifos emissions into surrounding communities.

**D. <u>The Neurotoxicity of Chlorpyrifos</u>**

46. Chlorpyrifos (O,O-diethyl O-3,5,6-trichloro-2-pyridyl phosphorothioate) is a synthetic organophosphate insecticide. It kills insects by attacking their nervous systems. Once inside the body, chlorpyrifos is converted into chlorpyrifos-oxon, which blocks acetylcholinesterase, an enzyme that nerve cells in insects and humans alike need in order to function.

47. Chlorpyrifos also directly injures the neurons that produce dopamine, known as dopaminergic neurons. It damages their mitochondria, the structures that supply the cell's energy. It causes oxidative stress, which damages the cell from within, and it triggers inflammation in the brain. It also disrupts autophagy, the process neurons use to clear out damaged proteins. When that process fails, a protein called alpha-synuclein builds up inside the neurons.

48. Laboratory research shows that this injury occurs at lower concentrations than those that block acetylcholinesterase and disrupt acetylcholine signaling, and that it lasts. In a 2023 study, for example, chlorpyrifos and chlorpyrifos-oxon impaired dopamine-dependent behavior at concentrations below those that affected acetylcholine signaling. When exposure stopped, the acetylcholine effects resolved. The dopamine deficits did not. That injury defines Parkinson's disease, a progressive, neurodegenerative brain disorder. Its symptoms result from the death of

dopaminergic neurons in a region of the brain called the substantia nigra. In most people with the disease, the damaged neurons contain Lewy bodies, which are abnormal clumps of alpha-synuclein. Each of the injuries described above is a recognized pathway to that neuron loss, and chlorpyrifos sets each of them in motion.

49. Dopaminergic neurons that die do not regenerate, so the loss is permanent, and by the time the hallmark symptoms of Parkinson's disease appear (slowness of movement known as bradykinesia, resting tremor, muscle rigidity, and impaired balance), a large share of those neurons are already gone.

50. As the disease progresses, people with Parkinson's disease commonly develop freezing in place, repeated falls, impaired speech, and trouble swallowing that can cause choking and pneumonia, along with depression, anxiety, hallucinations, bladder dysfunction, and pain. Dementia develops in more than 80 percent of people who have lived with the disease for twenty years. There is no cure, and no treatment slows or stops the underlying neurodegeneration, so the disease continues to worsen for the rest of the person's life. Many people with Parkinson's disease end up depending on others for the most basic tasks of daily life.

**E. <u>Chlorpyrifos Exposure Causes Parkinson's Disease</u>**

51. Peer-reviewed epidemiological and mechanistic research establishes that exposure to chlorpyrifos, including the exposure experienced by people who live and work near where it is applied, causes Parkinson's disease.

52. The link between chlorpyrifos and the brain's dopamine system has been documented for over 25 years. In 2001 and 2002, researchers at Virginia Polytechnic Institute reported that chlorpyrifos given to mice reduced dopamine uptake in the striatum, the region served by the dopamine neurons of the substantia nigra. It also increased dopamine turnover, impaired mitochondrial function, and reduced the animals' movement.

53. Beginning in 2009, UCLA researchers studying Parkinson's patients and population controls in California's Central Valley used the State's own pesticide use reports to estimate exposure at participants' homes, workplaces, and private wells. They found that chlorpyrifos exposure increased the risk of Parkinson's disease, whether people lived and worked near the

applications or drank well water near treated fields. A study in East Texas reported a similar association among people who had used chlorpyrifos products. All of this research was published while Defendants were still selling chlorpyrifos ECs.

54. In December 2025, a UCLA team published a study pairing human epidemiology with experiments in two animal species. Residential exposure to chlorpyrifos was associated with more than a 2.5-fold increased risk of Parkinson's disease. The researchers also exposed mice to airborne chlorpyrifos, replicating inhalation, the primary route of exposure for people living near treated fields. The mice developed motor impairment, lost dopaminergic neurons in the substantia nigra, and accumulated the pathological form of alpha-synuclein. In zebrafish, the researchers traced the neuron loss to failed autophagy and found that restoring autophagy protected the neurons.

55. The authors concluded that "relevant exposures in animal models establish biological plausibility" for the increased risk they found in people. The human, animal, and mechanistic evidence all point the same way: people exposed to chlorpyrifos near where it is applied develop Parkinson's disease at higher rates.

### F. <u>Decades of Regulatory Scrutiny and Mounting Evidence of Chlorpyrifos's Risks to Human Health</u>

56. Chlorpyrifos was first registered for use by Dow Chemical in the United States in 1965 under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which governs the registration, distribution, sale, and use of pesticides. 7 U.S.C. § 136 *et seq.* Throughout the decades that followed, Defendants continued to manufacture and sell chlorpyrifos products despite mounting evidence of their neurological hazards and their potential to expose individuals far beyond the intended areas of application.

57. From the earliest regulatory reviews, the U.S. Environmental Protection Agency ("USEPA") repeatedly identified deficiencies in the environmental and toxicological data submitted by Dow Chemical. Throughout the 1970s, USEPA requested information concerning chlorpyrifos residues, environmental fate, and the solvents used in Lorsban 4E (a chlorpyrifos EC). In 1977, USEPA specifically required volatility studies under actual use conditions, including air monitoring at treated sites. USEPA's subsequent review of chlorpyrifos in the 1980s found most

of Defendants' toxicology studies to be deficient, incomplete, or unacceptable and required additional testing concerning inhalation toxicity, chronic exposure, mutagenicity, and metabolism.

58. Defendants nevertheless relied on studies that materially underestimated or failed to adequately characterize chlorpyrifos's risks. Among them was a Dow-sponsored human study conducted in 1971 (the "Coulston Study"), which was not submitted to USEPA until 1984. A subsequent independent analysis identified the exclusion of valid baseline measurements that, if included, would have changed a reported finding of no statistically significant effect into a statistically significant one. Despite these deficiencies, USEPA relied on the study's reported no-observed-effect level in its long-term chlorpyrifos risk assessments for years.

59. Although the potential for chlorpyrifos to migrate beyond its intended application areas was known or reasonably knowable to Defendants for decades, USEPA's regulatory evaluations initially focused on dietary and indoor-use exposures. The risks to applicators and to bystanders from spray drift and post-application volatilization received comparatively limited consideration, due in part, on information and belief, to the deliberately narrow scope of studies and exposure models developed or sponsored by Defendants.

60. When USEPA began evaluating exposure from post-application volatilization in 2011, it recognized that inhalation was an important exposure pathway and that field volatilization could be more significant than Defendants' laboratory studies suggested. Air monitoring at the edges of treated fields revealed chlorpyrifos concentrations exceeding USEPA's level of concern in both acute and longer-term exposure scenarios.

61. In response to USEPA's concerns about spray drift, Defendants and other registrants agreed in 2012 to reduce certain application rates and to establish buffer zones ranging from 10 to 100 feet. However, the buffer zones did not mitigate the risk. In its 2016 revised risk assessment, USEPA determined that spray drift still posed risks of concern at the field edge, and that scenarios evaluated required buffer distances of 300 feet or more. USEPA also found chlorpyrifos concentrations in the air surrounding treated fields exceeding the Agency's levels of concern at every monitoring location evaluated.

62. California's regulatory findings were particularly significant for individuals exposed to chlorpyrifos during and following pesticide applications. In its 2018 evaluation of chlorpyrifos as a toxic air contaminant, the California Department of Pesticide Regulation ("CA DPR") identified substantial risks from airborne exposure, including exposure extending beyond the boundaries of treated agricultural fields. CA DPR determined that airborne chlorpyrifos could account for up to 95 percent of aggregate exposure risk to bystanders and that modeled air concentrations supported designating chlorpyrifos as a toxic air contaminant.

63. In 2019, CA DPR filed an action against Defendants seeking cancellation of their chlorpyrifos registrations, including the emulsifiable concentrates, on the ground that their use was detrimental to public health. In response, Defendants agreed to withdraw their chlorpyrifos products from the California market, with sales ending on February 6, 2020, and most remaining uses prohibited after December 31, 2020. On February 6, 2020, Defendants announced they would stop producing chlorpyrifos by the end of the year.

64. While the regulatory actions described above were the culmination of decades of mounting evidence concerning the dangers posed by chlorpyrifos, Defendants' knowledge of the risks associated with their chlorpyrifos products was not dependent on regulatory findings. For decades, Defendants knew or should have known that chlorpyrifos was neurotoxic and that their chlorpyrifos ECs could expose applicators, agricultural workers, bystanders, and surrounding communities to the chemical through dermal contact and inhalation during handling, mixing, loading, and application, as well as contact with treated surfaces, spray drift and post-application volatilization. Nevertheless, Defendants continued to manufacture and sell these products without adopting available safer formulations designed to reduce human exposure through these pathways. As alleged below, Defendants possessed the knowledge, technology, and ability to develop and commercialize safer chlorpyrifos formulations but chose not to adopt them for their widespread agricultural and other outdoor uses.

### G. The Defective Design of Defendants' Emulsifiable Concentrate Formulations

#### 1. Defendants' Formulation Choices Unnecessarily Increased the Risk of Human Exposure

65. When formulating chlorpyrifos for wide-area agricultural and outdoor pest control, Defendants chose to design, manufacture, register, sell, and distribute the chemical as an unshielded emulsifiable concentrate ("EC"), sold under brand names including but not limited to its flagship brands, Lorsban 4E and Dursban.

66. Defendants' chlorpyrifos EC formulations were designed as liquid concentrates typically containing:

a. **Active Ingredient:** up to 44.9% of bioavailable chlorpyrifos (O,O-diethyl O-3,5,6-trichloro-2-pyridyl phosphorothioate);

b. **Aromatic Solvent Carrier:** Up to 22.8% aromatic petroleum solvent (including xylene and related aromatic petroleum distillates); and

c. **Surfactants & Emulsifiers:** Chemical emulsifying agents designed to disperse the solvent-dissolved active ingredient into water for spray application.

67. Defendants designed Lorsban 4E, for example, to be broadcast across millions of outdoor acres, including corn, cotton, citrus, tree nuts, alfalfa, soybeans, and fruit orchards, at application rates of 2 to 4 pounds of active ingredient per acre (4 to 8 pints of product per acre on orchard floors). Defendants' product design contemplated application via high-pressure ground boom sprayers, orchard airblast atomizers, chemigation systems, and aerial aircraft spray systems – application methods that generate airborne spray droplets and result in widespread deposition of chlorpyrifos on vegetation and soil, creating opportunities for off-target drift during application and volatilization afterward.

68. This emulsifiable concentrate formulation design left the active organophosphate ingredient entirely unprotected, dissolved in a volatile solvent rather than enclosed in a protective capsule, making chlorpyrifos readily available for dermal absorption and inhalation during handling and application and allowing it to drift, volatilize, and migrate beyond the intended treatment area during and after application. The petroleum solvent system Defendants chose further facilitated post-application volatilization and, on information and belief, off-target drift during

application: as spray droplets traveled and after they deposited onto crop canopies, orchard soils, and other surfaces, the volatile solvent itself evaporated, leaving unshielded chlorpyrifos free to convert to a vapor phase, evaporate into the ambient air, and migrate off-site.

69. As a direct consequence of this design, individuals handling, mixing, loading, and applying Defendants' chlorpyrifos ECs were exposed to readily bioavailable chlorpyrifos through dermal contact and inhalation, while significant quantities of the chlorpyrifos applied according to label specifications also routinely drifted off-target during application and volatilized afterward, exposing individuals in surrounding areas.

70. Defendants' formulation choices directly affected the amount of chlorpyrifos available for human absorption during and following pesticide application. By selling chlorpyrifos in emulsifiable concentrates instead of safer formulations, Defendants unnecessarily increased the amount of chlorpyrifos to which applicators, agricultural workers, and individuals in surrounding communities were exposed through dermal contact and inhalation. These increased exposures contributed to the amount of chlorpyrifos absorbed by Plaintiff and were a substantial factor in causing Plaintiff to develop Parkinson's disease.

**2. <u>Safer, Feasible Alternative Designs Existed and Were Known to, Developed by, and Used by Defendants</u>**

71. At all times when Defendants manufactured, registered, and sold chlorpyrifos ECs, safer, technologically practical, and economically feasible formulation designs were available and established within the agricultural chemical industry.

72. Foremost among these feasible alternative designs, for example, was microencapsulation (also referred to as Capsule Suspension, "CS"). In a capsule suspension, microscopic droplets of technical chlorpyrifos are enveloped within thin, protective polymeric shells (such as polyurea, polyurethane, or polyamide) and suspended in an aqueous (water-based) carrier medium, eliminating or substantially reducing reliance on volatile petroleum solvents.

73. The physical barrier provided by the microcapsule shell can mitigate the principal defects of the emulsifiable concentrate design by:

a. **Reducing Immediate Bioavailability and Dermal Exposure:** Enclosing the active ingredient within a protective membrane that controls its release and reduces the immediate availability of chlorpyrifos for dermal absorption during handling, mixing, loading, and application, as well as upon contact with spray drift, contaminated clothing, equipment, and treated surfaces;

b. **Mitigating Inhalation Exposure, Drift, and Volatilization:** Reducing the potential for inhalation exposure during and following application by limiting the immediate release of chlorpyrifos into the air and lowering post-application vapor emissions from treated crops, soil, and turf, thereby reducing exposure among applicators, agricultural workers, and individuals living or working in surrounding communities;

c. **Substantially Reducing Volatile Petroleum Hydrocarbons:** Replacing hazardous aromatic petroleum solvents with an aqueous suspension, and thus eliminating or substantially reducing the volatile solvent carrier that contributes to airborne emissions and may facilitate and accelerate dermal absorption of chlorpyrifos; and

d. **Extending Residual Efficacy:** Maintaining effective insect control across treated foliage significantly longer than emulsifiable concentrates, potentially reducing the frequency of pesticide application and the associated opportunities for human exposure.

74. The feasibility of microencapsulated chlorpyrifos was not a theoretical concept; it was an established technology developed, patented, and commercialized by Defendants themselves.

75. By the early 1970s, the agricultural chemical industry established that organophosphate insecticides could be made markedly safer to humans by enclosing them in microcapsules. By 1972, Pennwalt Corporation had developed Penncap-M, a microencapsulated formulation of the organophosphate methyl parathion, formulated as an aqueous slurry of microcapsules that could be applied through conventional ground and aerial spray equipment. Pennwalt reported that the microencapsulated formulation was at least twelve times less toxic by dermal absorption and six times less toxic by ingestion than the emulsifiable concentrate formulations, all while exhibiting increased insecticidal activity and longer residual control. Pennwalt's published work further established that the rate at which the active ingredient was released (and thus its bioavailability) could be controlled by the parameters of the capsule wall. Enclosing an organophosphate in a polymer shell to reduce its human toxicity, particularly through

dermal exposure, while maintaining or extending efficacy, was thus a recognized and commercially proven approach by the mid-1970s.

76. Controlled-release and microencapsulation were not distant industry developments to Defendants; Defendants were among the companies that developed and used them.

77. As early as 1980, Defendants were developing and patenting controlled-release delivery systems to govern how their agricultural chemicals, including chlorpyrifos, are released after application. Dow scientist Donald Kangas filed a patent application in May 1980 for "Stable Insecticide Containing Latexes, Method of Making and Method of Distributing Insecticide," in which chlorpyrifos was dissolved in polymeric solids of latex to create an aqueous dispersion that would hinder volatilization and help the chlorpyrifos penetrate soil and last longer than the Lorsban 4E emulsifiable concentrate. The polymer version outperformed the chlorpyrifos EC in depth and persistence. (U.S. Patent No. 4,303,642, filed 1980 and granted 1981). Defendants also developed and patented controlled-release system for herbicides. ("Herbicidal Latex Dispersion for Controlled Delivery and Release of Herbicides," U.S. Patent No. 5,154,749, filed 1989 and claiming priority to 1985).

78. Defendants also separately developed and deployed microencapsulation for herbicides and even applied microencapsulation to chlorpyrifos itself – but only for the indoor market. Beginning in or around 1990, Defendants registered and were selling a microencapsulated chlorpyrifos insecticide, Empire 20 (EPA Reg. No. 62719-88), for indoor and structural pest control in homes, schools, hospitals, and food-handling and commercial facilities. By 1995, Defendants had filed a patent application for a microencapsulated chlorpyrifos (U.S. Patent No. 5,925,464). Defendants were also manufacturing and selling a microencapsulated herbicide product, TopNotch, patented microencapsulated formulations of additional active ingredients, including a turf herbicide, and microencapsulated oils designed to control pesticide spray drift. Defendants thus possessed the capsule chemistry, the materials and monomer supply, the manufacturing base, a registered product, and the formulation scientists necessary to develop microencapsulated chlorpyrifos formulations for widespread agricultural and other outdoor uses, where such

formulations could reduce human exposure during and following pesticide application, but simply chose not to.

79. The broader industry treated safer organophosphate delivery as established. A competing manufacturer (Monsanto) independently patented an encapsulated chlorpyrifos in 1997, and another third party patented a microencapsulated formulation of the organophosphate cadusafos in 1998 for the express purpose of reducing the organophosphate's toxicity because the conventional formulation "required full body protection" to handle.

80. In 2009, Defendants' later microencapsulation patent application, U.S. Patent No. 8,916,520, confirmed that Defendants' agricultural chlorpyrifos emulsifiable concentrate could be made safer by the same means. Benchmarking microencapsulated chlorpyrifos directly against Lorsban 4E (the flagship chlorpyrifos EC), Defendants reported that the encapsulated design was roughly eight to sixteen times less acutely toxic while delivering equal or better insecticidal performance. The patent also attributed the loss of chlorpyrifos from Lorsban 4E spray to volatilization and recognized that encapsulation reduces it.

81. In the 2009 patent application, Dow AgroSciences (now Defendant Corteva Agriscience) reports that Lorsban 4E has an LD50 (median lethal dose) in female rats of approximately 300 milligrams per kilogram, while the experimental microcapsule formulations had LD50 values greater than 2,500 milligrams per kilogram and, in certain embodiments, greater than 5,000 milligrams per kilogram. That is roughly an eight to sixteen-fold reduction in acute oral toxicity in Defendants' own testing. The "LD50" is a standard measure of acute oral toxicity: the amount of a substance, expressed as mass per unit of body weight (*e.g.*, milligrams per kilogram), expected to kill fifty percent of a test population under specified conditions. A lower LD50 denotes a more toxic substance (less is needed to cause death); a higher LD50 denotes a less toxic one (more is required). Because the active ingredient (chlorpyrifos) was identical in both the emulsifiable concentrate and the microencapsulated formulation, this eight- to sixteen-fold difference in acute oral toxicity reflects the difference in how each formulation delivered the same chemical to the test animal. The microcapsule shell slowed and limited the release of chlorpyrifos, reducing the amount of active ingredient absorbed – that is, its bioavailability. The emulsifiable concentrate, by contrast,

left the chlorpyrifos unshielded and dissolved in solvents that promoted its absorption, making the same quantity of active ingredient far more biologically available to the animals' system. The physical features that reduced bioavailability (a capsule barrier and controlled release of the active ingredient) are not specific to any species and are not unique to the test animals. They govern how much chlorpyrifos is absorbed by humans exposed to Defendants' products in the same way, including Plaintiff.

82. The safer alternative design did not sacrifice performance. In Defendants' own trials, encapsulated chlorpyrifos matched or outperformed Lorsban 4E against both chewing and contact pests. The microencapsulated chlorpyrifos held 100 percent control of beet armyworm at eight days after treatment against roughly 13 percent for Lorsban 4E in a pepper trial, and microencapsulated chlorpyrifos achieved 98 percent control of cotton aphid at seven days against 41 percent for Lorsban 4E at the same rate. These results demonstrated that microencapsulation could maintain or improve insecticidal efficacy while controlling the release characteristics of chlorpyrifos.

83. Defendants' patent further demonstrates their knowledge of the relationship between formulation design, chlorpyrifos release, and the potential for human exposure. The patent attributes the microcapsules' superior activity to the "significant loss of chlorpyrifos in a Lorsban 4E spray" as treated plants dry (volatilization) and explains that encapsulation, by delaying volatility, provides longer control. Defendants thus knew that their emulsifiable concentrate design released chlorpyrifos into the air and that encapsulation reduced that release. The patent further confirms that the release characteristics of chlorpyrifos were a design parameter that could be controlled through formulation choices, including adjustments to capsule and shell thickness, and identifies "low or ideally absent toxicity towards animals such as mammals, especially humans," as a design objective.

84. Federal and state pesticide regulations did not prohibit Defendants from developing and seeking registration of safer alternative designs. A pesticide registrant may develop and register a reformulated or alternative product and may amend or withdraw a registration. At all relevant times, Defendants were free to design, register, and sell a safer chlorpyrifos product in place of the

defective one or to withdraw or decline to sell the defective one. That Defendants patented and, for other actives, commercialized the safer design confirms that a safer alternative design was not merely feasible in the abstract but within Defendants' own established capabilities.

### 3. Defendants Deliberately Withheld the Safer Design from Their Agricultural and Other Outdoor ECs

85. Defendants applied controlled-release and microencapsulation technology to their herbicides, to other insecticides, to spray-drift control, and to chlorpyrifos for the indoor market – but not to the high-volume agricultural and other outdoor chlorpyrifos ECs that exposed applicators, agricultural workers, and individuals in surrounding areas to readily bioavailable chlorpyrifos through direct contact, inhalation, spray drift, and post-application volatilization. Instead, Defendants continued to manufacture and sell the chlorpyrifos ECs that injured Plaintiff throughout the period when safer designs were available to, developed by, and used by Defendants themselves.

86. At all relevant times, and on information and belief, chlorpyrifos was one of Defendants' most lucrative agricultural product lines, generating hundreds of millions of dollars in annual revenues. According to the EPA, between 1987 and 1998, chlorpyrifos was the single most widely used conventional insecticide in the United States, with domestic usage reaching 21 to 24 million pounds of active ingredient annually. Roughly half, approximately 11 million pounds, was applied in non-agricultural settings such as homes, schools, golf courses, and parks, and approximately 10 million pounds were applied to agricultural crops.

87. Despite possessing the technology, commercial experience, and manufacturing capability to produce microencapsulated formulations, Defendants deliberately restricted microencapsulated chlorpyrifos to limited specialty markets. Rather than extending this technology to their high-volume agricultural and outdoor lines, Defendants continued to manufacture, promote, and sell Lorsban 4E and other chlorpyrifos ECs as their principal formulation for those uses.

88. Upon information and belief, despite knowing the risk of harm their chlorpyrifos ECs posed to applicators, agricultural workers, bystanders and other individuals foreseeably exposed, Defendants chose to maintain the EC formulation to avoid the capital expenditures and higher per-unit production costs required to transition their high-volume agricultural and other

outdoor products from cheap petroleum solvent-based ECs to water-based capsule suspensions, prioritizing established profit margins over safety.

89. The inherent risks of Defendants' chlorpyrifos EC design—specifically, the immediate availability of chlorpyrifos for dermal absorption and inhalation during handling, mixing, loading, and application, as well as off-target spray drift and the significant, continuous, multi-day post-application volatilization and migration of chlorpyrifos into surrounding areas—substantially outweighed any benefits of that design, especially given that Defendants already understood, possessed, developed, and commercialized feasible, safer microencapsulated alternative designs.

90. On information and belief, at relevant times, the acts and omissions alleged herein were undertaken, authorized, and/or ratified by officers, directors, and/or managing agents of each Defendant who exercised substantial discretionary authority over corporate policies and decisions concerning the design, formulation, manufacture, marketing, and continued sale of Defendants' chlorpyrifos ECs. Despite knowing of the unreasonable risks posed by Defendants' chlorpyrifos ECs, including the risks of neurological injury and the availability of safer alternative formulations, these individuals nevertheless authorized, approved, and/or ratified the continued manufacture and sale of these products without adopting available safer designs. In doing so, they acted with willful and conscious disregard for the health and safety of individuals foreseeably exposed to Defendants' products, including Plaintiff.

### H. Plaintiff's Exposure to Defendants' Chlorpyrifos Products and Development of Parkinson's Disease

91. Since 1998, Plaintiff has lived on El Paseo Avenue in Clovis, California, in Fresno County. Between at least 1998 and 2002, while residing at this location, Defendants' chlorpyrifos ECs were repeatedly applied to land in the vicinity of Plaintiff's home, as reflected in the California Department of Pesticide Regulation's Pesticide Use Reporting ("PUR") records.

92. As a result of these and other nearby applications of Defendants' chlorpyrifos ECs, Plaintiff was repeatedly and regularly exposed from approximately 1998 to 2002 to chlorpyrifos and chlorpyrifos-oxon in the ambient air and on surfaces in and around Plaintiff's home. Plaintiff

inhaled and absorbed chlorpyrifos and chlorpyrifos-oxon from Defendants' chlorpyrifos ECs, and those chemicals entered Plaintiff's body. Plaintiff's exposure was a reasonably foreseeable consequence of Defendants' design and sale of chlorpyrifos ECs for agricultural and other outdoor pest-control operations in California.

93. Later, from approximately 2009 until he was forced to retire in early 2026 due to his Parkinson's disease, Plaintiff worked for a farm equipment supplier in Exeter, California in Tulare County. Plaintiff's office was surrounded by citrus orchards and other fields that, as confirmed by PUR records, were regularly treated with Defendants' chlorpyrifos ECs. Plaintiff's responsibilities included in-field research and development, which required entering land treated with Defendants' chlorpyrifos ECs and resulted in contact with vegetation, soil, and other surfaces treated with these products.

94. As a result of working in and around areas treated with Defendants' chlorpyrifos ECs, Plaintiff was repeatedly and regularly exposed from approximately 2009 to 2018 to chlorpyrifos and chlorpyrifos-oxon through dermal contact with treated vegetation, soil, and other contaminated surfaces, as well as through inhalation of airborne chlorpyrifos during and following pesticide applications. Plaintiff inhaled and absorbed chlorpyrifos and chlorpyrifos-oxon from Defendants' chlorpyrifos ECs, and those chemicals entered Plaintiff's body. Plaintiff's exposure was a reasonably foreseeable consequence of Defendants' design and sale of chlorpyrifos ECs for agricultural and other outdoor pest-control operations in California.

95. As a direct and proximate result of exposure to Defendants' defectively designed chlorpyrifos ECs, Plaintiff developed Parkinson's disease. Plaintiff's exposure to chlorpyrifos from Defendants' chlorpyrifos ECs was a substantial factor in causing Plaintiff's Parkinson's disease. Plaintiff was diagnosed with Parkinson's disease at Community Regional Medical Center in Fresno, California on or about November 16, 2021.

96. As a direct and proximate result of exposure to Defendants' defectively designed chlorpyrifos ECs, Plaintiff has suffered and will continue to suffer severe and permanent injury, physical pain, mental anguish, and loss of enjoyment of life, together with substantial past and future medical expenses and lost earnings, in amounts to be proven at trial.

97. Plaintiff developed Parkinson's disease following a period of prolonged exposure to Defendants' chlorpyrifos ECs. Because Parkinson's disease has a latency period and develops years after the exposures that cause or contribute to its development, Plaintiff did not know and had no reason to suspect that exposure to chlorpyrifos caused or contributed to Plaintiff's disease prior to 2026, when Plaintiff first became aware of the potential causal relationship between chlorpyrifos exposure and Parkinson's disease.

98. Before that time, Plaintiff neither knew nor reasonably should have known facts sufficient to suspect that Defendants' chlorpyrifos ECs had caused or contributed to Plaintiff's Parkinson's disease. Despite the exercise of reasonable diligence, Plaintiff could not have discovered the connection between the disease and the alleged wrongful conduct of Defendants at an earlier time. Accordingly, Plaintiff's claims did not accrue until Plaintiff discovered, or reasonably should have discovered, the factual basis for those claims.

## I. <u>Limitation on Allegations</u>

99. Plaintiff's claims arise solely from the defective design and formulation of Defendants' chlorpyrifos ECs and from Defendants' negligence in designing, formulating, and testing those products. Plaintiff asserts only the state common law claims pleaded herein for strict liability (design defect) and negligence.

100. Plaintiff does not assert, and expressly disclaims, any claim for failure to warn, inadequate labeling, or any other claim premised on the content, adequacy, or sufficiency of the labeling or packaging of Defendants' chlorpyrifos ECs. Plaintiff does not seek to impose on Defendants any labeling or packaging requirement that is in addition to or different from any requirement under FIFRA. The duties underlying Plaintiff's claims (to adopt a safe product design and to exercise reasonable care in the design, formulation, and testing of the product) exist independently of FIFRA and do not depend on the content of any FIFRA-approved label.

101. To the extent this Complaint references Defendants' product labels, FIFRA registrations, communications with the USEPA or the CA DPR, or other regulatory history, those references are made solely to establish matters other than the adequacy of any warning or label, such as Defendants' knowledge and notice of the hazards of their products, the foreseeability of the

exposures and injuries at issue, the technological and economic feasibility of safer alternative designs, and that Plaintiff's injuries resulted from the products' intended and reasonably foreseeable use without substantial change in their condition. No such reference is intended to assert that any label or warning was inadequate or that any different or additional warning was required.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### STRICT LIABILITY – DESIGN DEFECT

### (By Plaintiff Against Each Defendant)

102. Plaintiff re-alleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

103. At all relevant times, each Defendant designed, developed, manufactured, marketed, and sold chlorpyrifos ECs in California and across the United States.

104. Plaintiff was harmed by Defendants' chlorpyrifos ECs, which were defectively designed, and the defective design was a substantial factor in causing Plaintiff's harm.

105. At all relevant times, the chlorpyrifos ECs manufactured, distributed, marketed, and sold by Defendants were defective in one or more of the following respects:

a. They did not perform as safely as an ordinary consumer, end user, or other reasonably foreseeable person exposed to the products would have expected them to perform when used in an intended or reasonably foreseeable way; and/or

b. The foreseeable risks of the design outweighed the benefits of the design in that, among other things:

(i) Dissolving the unshielded volatile organophosphate in volatile petroleum solvent for widespread agricultural and other outdoor applications left chlorpyrifos readily available for dermal absorption and inhalation during handling, mixing, loading, and application, while also contributing to off-target spray drift during application and continuous volatilization into ambient air afterward. This formulation design unnecessarily exposed applicators, agricultural workers, and individuals living or working in surrounding communities to a dangerous neurotoxicant, which directly and proximately caused Plaintiff's neurological injuries;

(ii) The gravity and likelihood of the potential harm generated by this design were severe and foreseeable. Defendants' chlorpyrifos EC

design permitted direct exposure to readily bioavailable chlorpyrifos during handling and application, as well as exposure through contact with treated surfaces, off-target spray drift, and post-application volatilization into surrounding areas. As a result, applicators, agricultural workers, and bystanders were unnecessarily exposed to chlorpyrifos, a neurotoxic chemical that causes the debilitating and irreversible neurological disorder Parkinson's disease;

(iii) A safer alternative design was technically, mechanically, and economically feasible at the time of manufacture. In fact, using microencapsulation to mitigate the toxicity and volatility of organophosphates was an established practice across the agricultural chemical industry, and the safer alternative design was already developed, patented, and commercialized by Defendants themselves. Defendants possessed the industrial capacity to formulate chlorpyrifos as a capsule suspension, and it was at all relevant times economically feasible to do so;

(iv) The alternative microencapsulated design could maintain effective pest control and was not cost-prohibitive to manufacture. Microencapsulation provided a means to reduce the immediate bioavailability of chlorpyrifos, limit dermal and inhalation exposure, reduce drift, volatilization, and off-target migration, and substantially reduce acute mammalian toxicity by controlling the release of the active ingredient, all while prolonging insecticidal efficacy on the target surface;

(v) The foreseeable risks outweighed the design's benefits; and

(vi) On information and belief, Defendants instead chose to sell an emulsifiable concentrate design for their high-volume agricultural and other outdoor products to maximize profit margins and avoid the capital expenditures required to transition their manufacturing infrastructure to safer encapsulation technology.

106. Each Defendant's product was defective in design and unreasonably dangerous when it left each Defendant's possession and control. The defects continued to exist through the product's distribution to and use by end-users, who used the product in reasonably foreseeable ways, without any substantial change in the product's condition, and as intended and instructed on the products' labels.

107. At all relevant times, it was reasonably foreseeable to Defendants that applying chlorpyrifos ECs as intended and instructed would nonetheless expose individuals to chlorpyrifos and its oxon through dermal contact and inhalation during handling, mixing, loading, and

application; contact with treated surfaces; spray drift during application; and post-application volatilization. These exposures affected applicators, agricultural workers, and individuals living or working in and around treated areas, including Plaintiff.

108. As a direct and proximate result of each Defendant's product's defective design, Plaintiff developed Parkinson's disease, a serious, debilitating, and permanent neurological disorder, and other harms. The defective design of Defendants' chlorpyrifos ECs was a substantial factor in causing Plaintiff's injuries.

109. Because Defendants' chlorpyrifos ECs did not (1) perform as safely as an ordinary consumer, end user, or other reasonably foreseeable person exposed to the products would have expected them to perform, and/or (2) the risks of the design outweigh its benefits, Defendants' chlorpyrifos ECs were defective in design, and Defendants are strictly liable to Plaintiff for the resulting harm.

110. The conduct of each Defendant, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of applicators, agricultural workers, bystanders, and other individuals foreseeably exposed to Defendants' products, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

111. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

## (By Plaintiff Against Each Defendant)

112. Plaintiff re-alleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

113. At all relevant times, each Defendant designed, developed, manufactured, marketed, and sold chlorpyrifos ECs in California and across the United States.

114. Each Defendant owed Plaintiff a duty to exercise reasonable care and diligence in the design, development, manufacture, testing, marketing, and sale of its chlorpyrifos ECs and a duty not to create an unreasonable risk of harm from reasonably foreseeable and intended uses of its products.

115. Each Defendant owed Plaintiff a duty because its products were of a type that could endanger others if they were negligently designed or manufactured.

116. Imposing a duty on Defendants would benefit the community at large.

117. Imposing a duty on Defendants would not be burdensome because they at all relevant times had the technological and financial means to reduce the risks of harm to applicators, agricultural workers, bystanders such as Plaintiff, and other individuals foreseeably exposed to their chlorpyrifos ECs.

118. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its chlorpyrifos ECs as intended and instructed would nonetheless expose applicators, agricultural workers, bystanders, and other individuals, including Plaintiff, to chlorpyrifos through dermal contact and inhalation during handling, mixing, loading, and application; contact with treated surfaces; spray drift during application; and post-application volatilization.

119. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its chlorpyrifos ECs posed unreasonable risks of harm to individuals exposed during and following pesticide applications, including Plaintiff – risks that were known and knowable in light of the data and knowledge each Defendant had regarding its products.

120. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that exposure to chlorpyrifos and/or its oxon damages the brain's dopamine system and increases the risk of developing Parkinson's disease, a serious, debilitating, and permanent neurological disorder.

121. Each Defendant breached the aforementioned duties by, among other things:

a. negligently selecting formulation components, such as volatile aromatic solvents and uncontrolled-release carriers, that were unreasonably dangerous to applicators, agricultural workers, bystanders, and other exposed individuals, including Plaintiff, when safer formulations, including Defendants' own patented microencapsulated design, were available;

b. failing to adequately test chlorpyrifos for its capacity to cause Parkinson's disease, before and after marketing, despite knowledge of its neurotoxicity;

c. relying on testing that was not reasonably adequate to evaluate the neurotoxicity of chlorpyrifos and its capacity to cause Parkinson's disease, when a reasonably prudent manufacturer would have known that such testing was insufficient to assess the product's safety;

d. failing to reformulate or substitute a safer design for its chlorpyrifos ECs when a reasonably prudent manufacturer possessing the safer capsule chemistry Defendants had already commercialized for other products would have done so; and/or

e. failing to withdraw or stop selling their chlorpyrifos ECs when a reasonably prudent manufacturer would have done so.

122. A reasonable company under the same or similar circumstances as Defendants would have designed its product in a manner that was safer for applicators, agricultural workers, bystanders, and other individuals foreseeably exposed to the product, including Plaintiff.

123. As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiff developed Parkinson's disease, a serious, debilitating, and permanent neurological disorder, and suffered other harms. The harms and injuries Plaintiff suffered were foreseeable, and each Defendant's breach of one or more of its duties was a substantial factor in causing Plaintiff's injuries.

124. Each Defendant could have avoided Plaintiff's injuries by, for example, adopting a safer alternative design for its chlorpyrifos ECs, including the microencapsulated formulation Defendants had already developed and commercialized for other products, or withdrawing its chlorpyrifos ECs from the market. Instead, on information and belief, Defendants chose to sell an emulsifiable concentrate design for their high-volume agricultural and other outdoor products to maximize profit margins and avoid the capital expenditures required to transition their manufacturing infrastructure to safer encapsulation technology.

125. Had each Defendant stopped selling chlorpyrifos, adopted a safer formulation, or otherwise addressed the defective design of its product and the unreasonable risks of harm posed by its chlorpyrifos ECs, it is more probable than not that Plaintiff would not have suffered the resulting harms.

126. The conduct of each Defendant, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of applicators, agricultural workers, bystanders, and other individuals foreseeably exposed to Defendants' products, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

127. Plaintiff demands judgment against each Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for the above-referenced claims and causes of action, and as follows:

1. Past, present, and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial, to compensate Plaintiff for injuries sustained as a result of exposure to Defendants' product, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, and emotional distress;
2. Past, present, and future economic and special damages, according to proof at the time of trial;
3. Medical expenses, past and future, according to proof at the time of trial;
4. Punitive or exemplary damages according to proof at the time of trial;
5. Attorneys' fees;
6. For costs of suit incurred herein;
7. Pre-judgment and post-judgment interest as provided by law; and

8. For such other and further relief as the Court may deem just and proper.

## VII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: November 11, 2026 **WEITZ & LUXENBERG, P.C.**

By: */s/ Devin Bolton*

Devin Bolton (State Bar No. 290037)
WEITZ & LUXENBERG, P.C.
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Phone: (212) 558-5500
Fax: (212) 344-5461

Diana Gjonaj*
WEITZ & LUXENBERG, P.C.
3011 W. Grand Blvd, 24th Floor
Detroit, MI 48202
Phone: (313) 800-4167
Fax: (212) 344-5461

* *pro hac vice* application forthcoming

***Attorneys for Plaintiff***